JEFFREY S. SHINBROT, ESQ.
(SBN 155486)
jeffrey@shinbrotfirm.com
JEFFREY S. SHINBROT, APLC
8200 Wilshire Boulevard, Suite 400
Beverly Hills, California 90211
Telephone: (310) 659-5444
Fax (310) 878-8304
Special Litigation Counsel to Debtor Southern Inyo Healthcare District

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA FRESNO DIVISION

| | |
|---|---|
| In re<br><br>SOUTHERN INYO HEALTHCARE DISTRICT<br><br>Chapter 9 Debtor.<br><br>SOUTHERN INYO HEALTHCARE DISTRICT, plaintiff<br><br>v.<br><br>HEALTHCARE CONGLOMERATE ASSOCIATES, LLC; VI HEALTHCARE FINANCE, INC.; and DOES 1 through 10, defendants. | Bankruptcy Case No.: 16-10015<br>Chapter 9<br><br>Adv. Case No.: 18-01031<br>JSS1<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST VI HEALTHCARE FINANCE, INC., FOR SEQUESTRATION OF TAX REVENUES PENDING FINAL RULING ON THE MERITS OF THIS ADVERARY CASE OR FURTHER ORDER OF THIS COURT.**<br><br>**REQUEST FOR JUDICIAL NOTICE, DECLARATIONS OF JAQUE HICKMAN & RICHARD FEDCHENKO, CONCURRENTLY HEREWITH**<br><br>**Hearing:**<br>Date: November 29, 2018<br>Time: 1:30 p.m.<br>Place: Courtroom 11<br>     2500 Tulare St., 5th Fl<br>     Fresno, California |

I. INTRODUCTION ........................................................................................................1

II. FACTS ........................................................................................................................2

III. LEGAL AUTHORITY FOR THE RELIEF REQUESTED ..................................7

   A. Debtor is Likely to Prevail on its Equitable Subordination Claim and Demonstrate the Vi Agreement is Unconscionable ..........................................................................................9

   B. Debtor Will Suffer Irreparable Injury if the Preliminary Injunction is Not Granted ......11

   C. The Balance of Equities Tips in Debtor's Favor and in Inunction is in the Public Interest ..........................................................................................................................................11

   D. Conclusion ..................................................................................................................11

**Cases & Statutes**

11 U.S.C. § 510(c)(1)-(c)(2 ................................................................................................ 10

*Amoco Production Co. v. Village of Gambell, Alaska*, 480 US 531, 542 (1987) .......................... 7

*Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) ................... 8

*Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ................................................................ 9

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F2d 86, 91 (3rd Cir. 1992) ......................................... 8

*Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) .................. 8

*Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994 ............................................... 8

*De La Torre v. CashCall, Inc.*, 422 P.3d 1004 (Cal. 2018) ......................................................... 12

*Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) .............................................. 8

*Dogloo, Inc. v. Doskocil Mfg. Co., Inc.*, 893 F. Supp. 911, 917 (C.D. Cal. 1985) ........................ 7

Federal Rule of Bankruptcy Procedure 7065 ............................................................................... 13

Federal Rule of Civil Procedure 65 .............................................................................................. 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ............ 9

*Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1141 (9th Cir. 2005) .................................. 9

*Id.* at 22; *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 ..................................... 7

*In re Filtercorp, Inc.*, 163 F3d 570, 583 (9th Cir. 1998) ............................................................. 11

*In re First Alliance Mortg. Co.*, 471 F3d 977, 1006 (9th Cir. 2006) .......................................... 10

*In re Lazar*, 237 F3d 967, 985, fn. 19 (9th Cir. 2001) ................................................................ 11

*In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 597-598 (Bankr. ND Cal. 1994) ........... 11

*Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) .................................................................. 8

*Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) ......................................... 9

*Matter of Missionary Baptist Found. of America*, 818 F.2d 1135, 1147 (5th Cir. 1987) ............ 11

*Midgett v. Tri-County Metro. Transp. Dist. of Oregon*, 254 F3d 846, 850-851 (9th Cir. 2001) ... 8

*n re County of Orange*, 219 B.R. 543, 557 (Bankr. C.D. Cal. 1997) .......................................... 10

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) ............................... 10

*Robert Bosch LLC v. Pylon Mfg. Corp.* 659 F.3d 1142, 1155 (Fed. Cir. 2011) ............................ 9

*Sanchez*, supra, 61 Cal.4th at p. 910; *A & M Produce Co. v. FMC Corp*. (1982) 135 Cal.App.3d 473, 484 (*A & M Produce* .................................................................................................. 11

*Stanley v. University of Southern Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994) ............................... 7

*University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ........................................................ 9

*Weinberger v. Romero-Barcelo*, 456 US 305, 312 (1982) ............................................................. 7

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) .................................. 7

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2nd Cir. 2012) ............................................................. 9

# MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
# MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

Debtor Southern Inyo Healthcare District ("Debtor" or "District") seeks a preliminary injunction against Vi Healthcare Finance, Inc. ("Vi") enjoining Vi from enforcing any alleged security agreement in Inyo County tax revenues of any type; prohibiting enforcement of any alleged assignment by Debtor of Inyo County tax revenues of any type to Vi; or otherwise collecting any Inyo County tax revenues of any type to satisfy alleged debt owed to Vi by Debtor. The Debtor respectfully requests that the tax revenues allegedly assigned to Vi be sequestered pending a final ruling of the merits of this adversary case or pursuant to further Order of this Court.

Vi and Healthcare Conglomerate Associates, LLC ("HCCA")(both wholly owned by Dr. Yorai Benzeevi) engaged in a practice of negligence and breach of fiduciary duties to the District. Benzeevi and HCCA induced Debtor to allow HCCA complete control over its finances and operations and then failed to operate Debtor's facilities in accordance with minimal standards required of a medical facility, transferred and misappropriated funds from Debtor and intentionally concealed its bad acts from Debtor. After leaving the District with no viable financial options, HCCA prevailed upon the Debtor to borrow money from Vi at absurd and abusive interest rates and to assign tax revenues to Vi under threat that HCCA would not pay crucial vendors and medical professionals resulting in closure of its facilities. Incredibly, it was HCCA's acts and omissions that made the Vi financing necessary to continue operations.

It is critical that a preliminary injunction is issued to prevent Vi from collecting tax revenues that should be paid to the District on December 10, 2018 and thereafter until a final determination on the merits of this action. It is clear that that HCCA's and Vi's claims against Debtor are a direct result of Defendants' wrongful conduct and should be subordinated to all legitimate creditors' claims. The District is further likely to prove in this adversary case that

HCCA and Vi wrongfully transferred and misappropriated funds which should be repaid to Debtor, more than offsetting any amounts legitimately owed by Debtor to HCCA or Vi.

The District will suffer irreparable injury if the preliminary injunction is not granted as Debtor may forever lose tax revenues necessary to continue its operations. Vi appears to have no business other than the making of the loan to the Debtor and is controlled by Benzeevi. Further, in connection with ongoing criminal investigations the Tulare County District Attorney has recently seized nearly $1 million in the bank accounts of Benzeevi. Finally, The District does not propose to expend the sequestered revenues, it merely seeks to preserve the funds until further Order of this Court.

## II. **FACTS**[1]

This adversary case arises from multiple breaches of the duties of due care, contract and loyalty owed to the District by its former manager HCCA, which is wholly owned by Dr. Yorai Benzeevi, and Vi. [Plaintiff's Complaint is at ECF #1, in these adversary proceedings]. Benzeevi controls both HCCA and Vi, in fact, Benzeevi is the sole officer of both entities. [Request for Judicial Notice, Exhibits 4 and 5]. Recently, the Tulare County District Attorney seized nearly one million dollars ($1,000,000.00), in the bank accounts of Benzeevi. [RJN #6].

On or about January 2, 2016, the District and HCCA entered into a Management Services Agreement ("MSA," a true and correct copy is attached as Exhibit 1 to the Hickman Declaration). Pursuant to the MSA, HCCA was vested with the authority to manage the operational and financial aspects of the District's facilities. HCCA was specifically retained to provide "Bankruptcy Advice" and to "provide District with consultation and advice in connection with a potential filing by District of a proceeding under Chapter 9 of the Bankruptcy Code"; to "arrange and supervise the bankruptcy proceedings." The MSA also provided that the Chief Restructuring Officer, an employee of HCCA, "shall serve as the representative of the

---

[1] The following facts are based on the Declaration of Jaque Hickman ("Hickman Declaration") and Richard Fedchenko ("Fedchenko Declaration"), exhibits thereto and the Request for Judicial Notice filed concurrently herewith.

District in connection with any such Chapter 9 bankruptcy proceeding." The MSA required HCCA to provide financial and operating system management, prepare proposed annual budgets, do the purchasing for the District, contract with support and relationship management, recruit personnel, and supervise the day-to-day operations of the District's facilities.

While some facts many require discovery and a court determination, it is undisputed that HCCA did not collect the Debtor's accounts receivables as required, resulting in the need for emergency financing to pay critical vendors. It is also indisputable that HCCA communicated to the District that it was required to assign its tax revenues to Vi because, according to HCCA's Chief Financial Officer's advice to the Debtor **"SIHD has no choice but to accept the offer from Benny."** [Fedchenko Declaration, Exhibit "3"].

Despite HCCA's contractual obligations to provide these services to Debtor, once the MSA was entered HCCA personnel were rarely on site and HCCA's administrator's office was empty approximately ninety percent (90%) of the time. Between December 2016 and September 2017, HCCA made at least $1,250,000.00 in advances on the line of credit without Debtor's knowledge or consent. In March 2017, Benzeevi contended that the line of credit should be paid as an administrative claim in the bankruptcy case and indicated that HCCA would not advance further funds under the line of credit. During this same period of time, the Debtor learned HCCA had failed in its duties to collect accounts receivable to fund its operations and that the HCCA line of credit was in excess of $1,000,000.

In July 2017, under the threat of not making payroll, HCCA offered Debtor terms of a new line of credit. HCCA proposed to fold in the existing unsecured revolving line of credit at the 10% interest rate and provide new credit at 20% interest. HCCA also demanded that both the pre-petition and post-petition lines of credit would be secured by tax revenues.

On July 14, 2017, Alan Germany, HCCA's Chief Financial Officer, sent an electronic mail to message to board member Richard Fedchenko regarding the proposed VI financing, wherein Germany emphasizes the need to pay critical vendors and advised the Debtor that it had no choice to accept Benzeevi's outrageous deal terms.

1    To be clear, the Debtor's Bankruptcy Advisor told the Debtor that it had no choice but to
2 enter into a financing agreement that included an assignment of tax revenues and a 20% interest
3 rate, **with its affiliate**. See Exhibit 3 annexed to Fedchenko Declaration.
4    On advise of its Bankruptcy Advisor, on or about July 19, 2017, Vi, the Debtor entered a
5 Revolving Line of Credit Note (Secured) providing Debtor a $2,000,000 line of credit ("LOC"),
6 $1,038,789.56 of which was the existing amounts drawn on the pre-petition line of credit,
7 secured by all of Inyo County tax revenues, including "all property tax revenues, parcel tax
8 revenues, tobacco tax revenues, [] and any other tax revenues." The security for the LOC is
9 documented in the Assignment, Security Agreement and Pledge Agreement ("Security
10 Agreement"). A true and correct copy of the Security Agreement is attached to the Hickman
11 Declaration as Exhibit 2. The Security Agreement allows Vi to collect directly all county tax
12 revenues.
13    Among many contractual breaches, HCCA did not exercise reasonable care in the
14 collection of Debtor's accounts receivables. Instead, HCCA made little, if any, effort to collect
15 the accounts receivable. Had HCCA exercised reasonable care in the collection of the Debtor's
16 accounts receivables, the Vi line of credit and assignment of tax revenues would have been
17 unnecessary.
18    Debtor also discovered that HCCA acted below any reasonable standard of care in other
19 instances. For example, HCCA failed to respond to a signature request to complete a hospital
20 drug room certification per state regulations, which led to an expired drug room permit and a
21 citation from the State Board of Pharmacy and the California Department of Health. HCCA also
22 failed to respond to requests for evidence of an "organized medical staff" or pharmacy and
23 therapeutics committee, which led to citations. HCCA failed to have a defined admission
24 criteria or written infection control plan, which led to unsafe conditions and citations. HCCA
25 did not pay a contracted education vendor, which lead to the District failing to meet
26 requirements for initial staff education and re-training. HCCA hired ineffective and
27 inappropriate personnel that were costly to the District. Instead of providing administrative
28 personnel as part of the HCCA monthly management fee, as agreed under the MSA, HCCA

contracted administrative personnel and paid them with the District's payroll. Employee vacancies were primarily filled by travelers or temporary assignments by HCCA employees, which included the requirement of providing housing. As a result, housing costs for employees increased, and in most cases, HCCA failed to pay the housing bills. HCCA did not invest any money in providing job opportunities for local employees as HCCA alleged that it was too expensive to advertise in the local papers or on the radio. By employing its own employees at the District's facilities instead of hiring local permanent employees, HCCA was able to further inflate the amounts allegedly due from the District to HCCA. HCCA was unresponsive to vendors, the District Board, and the District's financial consultants. HCCA personnel refused to take calls and failed to return calls.

      HCCA's lack of response to vendors demanding payment for services led to disruption of hospital services. HCCA failed to timely respond to requests for a disclosure statement and cash flow projections made by the District's bankruptcy counsel and financial consultants, despite numerous attempts by the District to obtain the information and emails expressing the District's frustration. HCCA failed to make an intergovernmental transfer ("IGT") payment on behalf of the District in or about September 2017, which led to the District's loss of $300,000 in supplemental funds. The Debtor is informed and believes that HCCA caused supplies to be transferred from the Tulare District to the District. Throughout HCCA's relationship with the District, HCCA has failed to make efforts to assist the District in obtaining a bond and tax measure, even though HCCA represented to the District that it would do so and the District relied on that representation in deciding to contract with HCCA.

      In October 2017, the District further learned of the extent of HCCA's financial mismanagement. Counsel for the District obtained copies of bank statements and transactional records for the District's bank accounts ("Bank Records"). The Bank Records contained inconsistencies with certain reports and representations previously provided by HCCA and numerous transactions not authorized by the District Board. The Bank Records revealed numerous unauthorized transfers by and between the District and the Tulare District ("Tulare Transfers"). HCCA represented that the transfer of approximately $700,000 to Tulare District

on behalf of HCCA was in satisfaction of amounts owing under the line of credit extended by HCCA to the District. The Bank Records, however, demonstrate that the line of credit had a zero dollar balance as of the date of the $700,000 transfer. Accordingly, it appears that the representation that the transfer was in satisfaction of amounts due under the HCCA line of credit was false. Rather, these funds were transferred to Tulare on behalf of HCCA on account of management fees to HCCA and was not for the purpose of paying down the line of credit with HCCA.

On or about September 30, 2017, the Tulare District commenced its own Chapter 9 bankruptcy case. Shortly thereafter, the Tulare District filed a motion seeking authority to reject its management agreement with HCCA. The Tulare District has alleged similar wrongdoings by HCCA as those recently discovered by the District. In addition to alleging that the HCCA management agreement is oppressive and entirely one-sided (as it is here), the Tulare District avers that HCCA mismanaged its operations by, among other things, paying management fees at the expense of employees. The Tulare District has also alleged unauthorized transfers of funds by HCCA between the District and the Tulare District.

The financial reports prepared by HCCA represented that HCCA made numerous loans and thereafter received payment on account of the purported loans. The bank statements, however, appear to indicate that the payments were on account of HCCA's management fees— not the repayment of any advances on the line of credit which HCCA purported to extend.

On October 17, 2017, the District filed an emergency motion to terminate the MSA. On October 23, 2017, the Court entered an order authorizing the removal of HCCA as a signatory to the District's bank accounts and continued the hearing on termination of the MSA. On November 22, 2017, the District and MSA filed a settlement with the court agreeing to terminate the MSA. The settlement did not contain any releases of liability.

The District is scheduled to receive a county tax revenue payment on December 10, 2018. Thus, the District requires a preliminary injunction by that date.

///

///

## III. LEGAL AUTHORITY FOR THE RELIEF REQUESTED.

An injunction is an equitable remedy. "The basis for injunctive relief [preliminary or permanent] in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 US 305, 312 (1982); *Stanley v. University of Southern Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994). A court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief and particular regard should be given to the public interest. *Amoco Production Co. v. Village of Gambell, Alaska*, 480 US 531, 542 (1987); *Dogloo, Inc. v. Doskocil Mfg. Co., Inc.*, 893 F. Supp. 911, 917 (C.D. Cal. 1985).

A plaintiff seeking a preliminary injunction "must establish":

- "that he is likely to succeed on the merits";
- "that he is likely to suffer irreparable harm in the absence of preliminary relief";
- "that the balance of equities tips in his favor"; and
- "that an injunction is in the public interest."

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. *Id.* at 22; *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction"); *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (movant must make "clear showing" of likelihood of irreparable harm). Plaintiff must also demonstrate "immediate threatened harm." *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Establishing a risk of irreparable harm in the indefinite future is not enough. The harm must be shown to be imminent. *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F2d 86, 91 (3rd Cir. 1992); *Midgett v. Tri-County Metro. Transp. Dist. of Oregon*, 254 F3d 846, 850-851 (9th Cir. 2001).

A preliminary injunction may be granted to preserve a fund or property as to which the parties have conflicting claims so that it may be the subject of a final decree in the case. *See Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940); *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (preliminary injunction freezing assets to protect damages remedy allowed if "limited to the property in dispute or its direct, traceable proceeds").

Likewise, a defendant's insolvency factors into whether a plaintiff is entitled to a preliminary injunction: Courts should be more willing to grant a preliminary injunction against a judgment-proof defendant to prevent it from engaging in future damaging acts, even if the amount of any resulting damages could be readily calculated. The ability to calculate damages does not make that remedy adequate if plaintiff cannot collect the award: "A judgment-proof defendant is not deterred by the threat of money damages, so some other remedy (such as the contempt power) may be essential." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006); *see WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2nd Cir. 2012) (likelihood defendant would be unable to satisfy any substantial damage award supported injunctive relief); *Robert Bosch LLC v. Pylon Mfg. Corp.* 659 F.3d 1142, 1155 (Fed. Cir. 2011) (court should assess whether damage remedy is meaningful re defendant's financial condition before damages can be deemed adequate). For example, a preliminary injunction was properly issued to prevent a bank from honoring defendant's draw on a letter of credit pending the outcome of litigation between plaintiffs and defendant. Because defendant was shown to be insolvent, plaintiffs "would face a significant threat of irreparable injury if a preliminary injunction did not issue to prevent the Bank from honoring [Defendant's] draw." *Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1141 (9th Cir. 2005).

A preliminary injunction is customarily granted on the basis of procedures less formal and evidence less complete than at trial. Therefore, the moving party need not prove his or her case in full at a preliminary injunction hearing. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (plaintiff's evidence need not meet summary judgment standard). Once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the nonmoving party to show a

likelihood that its affirmative defense will succeed.  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

### A. **Debtor is Likely to Prevail on its Equitable Subordination Claim and Demonstrate that the Vi Agreement is Unconscionable.**

The Debtor is highly likely to prevail on its equitable subordination claim against Vi.  Once Vi's claim is subordinated to other creditors, it will not be entitled to enforce any security interest in the tax revenues and those revenues will be used to pay other creditors who acted equitably toward Debtor.  Courts have authority to: subordinate, for purposes of distribution, all or part of an allowed claim or interest to all or part of another allowed claim or interest under principles of equitable subordination or order that any lien securing such a subordinated claim be transferred to the estate.  11 U.S.C. § 510(c)(1)-(c)(2).  "The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results."  *In re County of Orange*, 219 B.R. 543, 557 (Bankr. C.D. Cal. 1997).  Courts apply a three-part test in determining whether equitable subordination is warranted:

　i.　The claimant must have engaged in inequitable conduct;
　ii.　The misconduct must have:
　　— resulted in injury to creditors, or
　　— conferred some unfair advantage on the claimant; and
　iii.　Equitable subordination must not be inconsistent with other provisions of the Bankruptcy Code.

*In re First Alliance Mortg. Co.*, 471 F3d 977, 1006 (9th Cir. 2006); *In re Lazar*, 237 F3d 967, 985, fn. 19 (9th Cir. 2001); *In re Filtercorp, Inc.*, 163 F3d 570, 583 (9th Cir. 1998).  In addition, several courts have employed equitable subordination as a remedy for fraudulent transfers where no other remedy is available.  *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 597-598

(Bankr. ND Cal. 1994); *see also Matter of Missionary Baptist Found. of America*, 818 F.2d 1135, 1147 (5th Cir. 1987).

Here, Vi acted inequitably by using Debtor's desperate financial situation, directly caused by its affiliate HCCA's gross mismanagement of Debtor, to induce Debtor to enter the highly unfavorable loan with a rate of interest of 20%, secured by tax revenues. Most, if not all, of the amounts allegedly due to HCCA that required refinancing through the Vi line of credit would not have been necessary had HCCA properly operated HCCA and made reasonable efforts to collect the Debtor's accounts receivables during this Chapter 9 case.

As the Debtor's Bankruptcy Advisor and potential lender, HCCA and Vi's conduct is well beyond inequitable and is, in fact, outrageous. The resulting injury to the Debtor is the potential for loss of much needed tax revenues and payment of an egregious rate of interest. The advantage to Vi is receipt what appears to be ill gotten gains.

In addition, the line of credit with Vi is should be subordinated based on the agreement itself being unconscionable and thereby inequitable and injurious. Recently, the California Supreme Court examined the enforceability of unconscionable agreements stating that:

> Unconscionability is a flexible doctrine. It is meant to ensure that in circumstances indicating an absence of meaningful choice, contracts do not specify terms that are "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience." (*Sanchez*, supra, 61 Cal.4th at p. 910; *A & M Produce Co. v. FMC Corp*. (1982) 135 Cal.App.3d 473, 484 (*A & M Produce*) ["Unconscionability is a flexible doctrine designed to allow courts to directly consider numerous factors which may adulterate the contractual process."].

*De La Torre v. CashCall, Inc.*, 422 P.3d 1004 (Cal. 2018). It is difficult to imagine how Vi will make a *good faith* argument that it, HCCA and Benzeevi provided any meaningful choice to the Debtor and that the terms of the agreement are not unduly oppressive and shocking to the conscience.

Equitable subordination of Vi's claim is consistent with the provisions of the Bankruptcy Code and will prevent Vi from unfairly advantaging over other creditors as a result of Vi's inequitable and wrongful conduct.

### B. Debtor Will Suffer Irreparable Injury if the Preliminary Injunction is Not Granted.

The Debtor will suffer irreparable injury if a preliminary injunction enjoining Vi from expending tax revenues is not granted and the revenues sequestered. The Debtor is informed and believes that the loan to Debtor is the sole asset of Vi and that Vi, like HCCA, is wholly owned and controlled by Benzeevi. The Tulare County District Attorney has recently seized nearly $1 million in the bank accounts of Benzeevi. In order to prevent irreparable injury to the District by the loss of revenues that should be available to pay legitimate claims, the assigned tax revenues must be sequestered and preserved.

### C. The Balance of Equities Tips in Debtor's Favor and an Injunction is in the Public Interest.

Since HCCA caused the need for financing and then, as its restructuring advisor, advised the Debtor that it has no other choice but to assign tax revenue Vi (another Benzeevi controlled entity), sequestration of the tax revenues is clearly equitable. The injunction also benefits the public with little or no harm to Vi. If Vi's claims are not subordinated, the tax revenues will be preserved for its benefit. But if Vi's claims are subordinated as expected by the Debtor, the public will be protected from dissipation of the much-needed tax revenues.

### D. Conclusion.

A preliminary injunction pursuant to Federal Rule of Bankruptcy Procedure 7065 and Federal Rule of Civil Procedure 65 enjoining VI Healthcare Finance, Inc., from enforcing an alleged security agreement in tax revenues; prohibiting enforcement of any alleged assignment of Inyo County tax revenues of any type; or otherwise collecting any Inyo County tax revenues of any type and sequestering those funds is required to prevent irreparable injury to the District and its creditors.

Dated: 10/31/18                         THE SHINBROT FIRM
                                        By:/s/Jeffrey S. Shinbrot
                                        Jeffrey S. Shinbrot, Special
                                        Litigation Counsel for the Southern Inyo
                                        Healthcare District